UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| JOHN SOKOLOSKI and GAIL SOKOLOSKI,<br><br>         Plaintiffs,<br><br>    v.<br><br>PNC MORTGAGE, a division of PNC BANK, NA and DOES 1 through 10, inclusive,<br><br>        Defendant. | CIV. NO. 2:14-1374 WBS CKD<br><br>MEMORANDUM AND ORDER RE: MOTION TO DISMISS |

----oo0oo----

        Plaintiffs John and Gail Sokoloski initiated this action in Yuba County Superior Court against defendant PNC Mortgage ("PNC"), bringing claims arising out of a disputed debt and the threatened foreclosure of their home.  Presently before the court is PNC's motion to dismiss plaintiffs' First Amended Complaint ("FAC") for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

1

1    I. Factual and Procedural Background

2            Plaintiffs took out a loan secured by a deed of trust

3    to purchase their home in Marysville, California. (FAC ¶¶ 1,

4    12.) Plaintiffs subsequently fell behind on their loan payments

5    and filed for Chapter 13 bankruptcy in the Eastern District of

6    California for the sole purpose of curing arrears on the loan.

7    (Id. ¶ 14.)

8            In the bankruptcy proceedings, PNC, plaintiffs'

9    creditor, asserted that plaintiffs owed a total balance of

10   $4,601.27, which included $4,176.27 in arrears as well as $425

11   that had accrued in post-petition attorney's fees. (Id. ¶¶ 14-

12   15.) The Chapter 13 plan called for sixty monthly payments in

13   the amount of $1,707.00. (Id.) A portion of the monthly payment

14   would cover a regular payment on the loan; the surplus would go

15   toward paying off the arrears and fees. (Id. ¶ 16.)

16           Thereafter, plaintiffs began to make payments according

17   to the plan. (Id.) In June 2013, PNC filed a "Notice of

18   Mortgage Payment Change" in plaintiffs' bankruptcy, proposing a

19   trial plan that would reduce plaintiffs' monthly loan payments

20   from $1,410.05 to $554.20 per month. (Id. ¶¶ 17-18.) As a

21   result, the bankruptcy trustee began paying the new monthly loan

22   rate of $554.20 on July 1, 2013. Plaintiffs continued to make

23   Chapter 13 plan payments in the amount of $1,707.00; however,

24   plaintiffs allege that because the portion going toward the

25   monthly loan payment was reduced under the modification, an even

26   greater surplus went toward paying off the arrears, attorney's

27

28
                                    2

1  fees, and administrative fees.  (Id. ¶ 20.)[1]  According to

2  plaintiffs, because of this payment scheme, plaintiffs were able

3  to pay off the $4,601.27 in arrears and fees earlier than

4  previously anticipated, completing their Chapter 13 plan

5  obligations.  (Id.)

6         On January 30, 2014, staff counsel for the Chapter 13

7  bankruptcy executed a "Notice of Final Cure Payment" regarding

8  plaintiffs' loan, which was sent to PNC.  (Id. ¶ 21.)  PNC failed

9  to respond to this notice within the time prescribed by law or to

10 make any objection to the trustee's final report and accounting.

11 (Id.)  Because plaintiffs had cured the arrears, the bankruptcy

12 trustee instructed plaintiffs to start making regular payments on

13 their loan directly to PNC beginning in January 2014.  (Id.)

14 Plaintiffs contacted PNC regarding the early termination of their

15 bankruptcy and inquired how much they should pay monthly, now

16 that their payments would go directly to the bank.  (Id. ¶ 22.)

17 PNC instructed plaintiffs to make monthly payments of their loan

18 in the amount of $1,410.05 beginning in January 2014.  (Id.)

19 From January 2014 through April 2014, plaintiffs made regular

20 monthly payments of $1,410.05 directly to PNC as instructed.

21 (Id. ¶ 24.)

22        Although plaintiffs believed they were current on their

23 payments and had paid of the arrears, on April 25, 2014, PNC

24 informed plaintiffs that their loan was in default and was in the

25        [1]     Plaintiffs do not specify how much of the $1,707
   monthly payment went to the arrears and fees.  However, it can
26 reasonably be inferred that if the current monthly loan payments
   were in the amount of $554.20, the balance of $1,152.80 went
27 toward the arrears, attorney's fees, and administrative fees.

28

3

1    foreclosure process.  (Id. ¶ 25.)  According to PNC, plaintiffs

2    owed PNC $10,526.91 to bring their loan current, which included

3    approximately $5,240.44 in foreclosure fees and costs.  (Id. ¶

4    26.)  PNC told plaintiffs that the bankruptcy trustee had made a

5    mistake by terminating the Chapter 13 plan.  (Id. ¶ 29.)

6    Plaintiffs spoke to the bankruptcy trustee, who nevertheless

7    confirmed that their payments had been made according to the

8    plan.  (Id.)

9         PNC maintains its threats to foreclose on the property

10   and that plaintiffs owe it $10,526.91 to bring the loan up to

11   date.  (Id. ¶ 30.)  Plaintiffs allege this amount is a

12   misrepresentation of how much they actually owe, because they are

13   current on their payments and have paid off the arrears.  (Id. ¶

14   26.)  Plaintiffs bring state law claims for negligence and breach

15   of the implied covenant of good faith and fair dealing.  They

16   also seek statutory damages, attorney's fees, and costs under the

17   Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§

18   1788-1788.32, and to enjoin PNC from engaging in unfair business

19   practices pursuant to California's Unfair Competition Law

20   ("UCL"), Bus. & Prof. Code § 17200, et seq.  PNC now moves to

21   dismiss all of plaintiffs' claims pursuant to Rule 12(b)(6) for

22   failure to state a claim upon which relief can be granted.

23   (Def.'s Mot. (Docket No. 17).)

24   II. Judicial Notice

25        In general, a court may not consider items outside the

26   complaint when deciding a motion to dismiss, but it may consider

27   items of which it can take judicial notice.  Barron v. Reich, 13

28   F.3d 1370, 1377 (9th Cir. 1994).  PNC requests that the court

1   take judicial notice of several exhibits, including the

2   solicitation letter PNC sent plaintiffs in May 2013 offering a

3   downward modification of their loan payment plan to $554.20 per

4   month.  (Req. for Judicial Notice (Docket No. 14-2).)  Plaintiffs

5   had attached Ex. 1, along with other materials, in support of the

6   complaint they filed in state court, but omitted it from their

7   FAC.  (Def.'s Mot. at 6.)  PNC attempts to use Exhibit 1 as a

8   basis for contradicting plaintiffs' allegations regarding PNC's

9   offer to reduce plaintiffs' monthly payments to $554.20.  (Id. at

10  7.)  Plaintiffs did not respond to PNC's request for judicial

11  notice.

12          Through the "incorporation by reference" doctrine, the

13  court may "take into account documents . . . alleged in a

14  complaint and whose authenticity no party questions, but which

15  are not physically attached to the [plaintiff's] pleading . . .

16  even though the plaintiff does not explicitly allege the contents

17  of that document in the complaint."  Knievel v. ESPN, 393 F.3d

18  1068, 1076 (9th Cir. 2005) (quotation marks and citations

19  omitted).  Plaintiffs allege the bankruptcy trustee made full,

20  timely payments on plaintiffs' current loan with PNC, in

21  accordance with a modified monthly payment plan initiated by PNC.

22  (FAC ¶¶ 17, 20.)  Because plaintiffs' FAC "incorporates" the

23  modification plan, the court will take judicial notice of Exhibit

24  1, the "Streamlined Modification Trial Plan Notice."

25          Second, the court will take judicial notice of Exhibit

26  2, the "Order to Close Chapter 13 Case Without Discharge," as

27  well as other filings in the Chapter 13 bankruptcy proceeding,

28  because they are matters of public record related to legal

1    proceedings in the district court.  See Rose v. Beverly Health

2    and Rehab. Servs., Inc., 356 B.R. 18, 22 (E.D. Cal. 2006) (Ishii,

3    J.) (taking judicial notice of filings in bankruptcy proceedings

4    although they were outside pleadings because they were public

5    records (citing Duke Energy Trading & Marketing, L.L.C. v. Davis,

6    267 F.3d 1042, 1048 n.3 (9th Cir. 2001) (taking judicial notice

7    of filings made in a related bankruptcy proceeding)).

8    III. Analysis

9         On a Rule 12(b)(6) motion to dismiss, the court must

10   accept the allegations in the complaint as true and draw all

11   reasonable inferences in favor of the plaintiff.  See Scheuer v.

12   Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by

13   Davis v. Scherer, 468 U.S. 183 (1984); Cruz v. Beto, 405 U.S.

14   319, 322 (1972).  To survive a motion to dismiss, a plaintiff

15   must plead "only enough facts to state a claim to relief that is

16   plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S.

17   544, 570 (2007).  This "plausibility standard," however, "asks

18   for more than a sheer possibility that a defendant has acted

19   unlawfully," and where a plaintiff pleads facts that are "merely

20   consistent with a defendant's liability," it "stops short of the

21   line between possibility and plausibility."  Ashcroft v. Iqbal,

22   556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).

23        As a preliminary matter, PNC argues that "plaintiffs'

24   omission from their FAC of how their Chapter 13 plan concluded is

25   fatal to their claims because the bankruptcy was closed but never

26   discharged."  (Def.'s Mot. at 5.)  According to PNC, plaintiffs

27   were not permitted to rely on the terms of their Chapter 13 plan

28   because they never obtained a formal discharge from bankruptcy

1    court.  In support, PNC cites the Bankruptcy code, which states,

2

3           [A]s soon as practicable after completion by the
            debtor of all payments under the plan . . . after such
4           debtor certifies that all amounts payable under such
            order or such statute that are due on or before the
5           date of certification . . . have been paid, unless the
            court approves a written waiver of discharge executed
6           by the debtor after the order for relief under this
            chapter, the court shall grant the debtor a discharge
7           of all debts provided for by the plan . . . .

8    11 U.S.C. § 1328(a).  Contrary to PNC's interpretation, nothing

9    in this provision suggests that, absent a formal discharge,

10   plaintiffs were not permitted to "rely on the terms of the plan,"

11   (Def.'s Mot. at 5-6), in alleging that they paid off the arrears.

12   This passage merely states that a debtor's eligibility for a

13   court-ordered discharge is predicated on "completion by the

14   debtor of all payments under the plan."  See Ellett v.

15   Stanislaus, 506 F.3d 774, 777 (9th Cir. 2007) ("A debtor who

16   completes payments under a Chapter 13 plan is entitled to a broad

17   discharge of all debts provided for by the plan . . . ."

18   (internal quotation marks omitted)).  The provision does not

19   suggest that a chapter 13 plan is not considered completed or

20   satisfied unless the debtor gets a formal discharge.

21           Plaintiffs allege that they cured their arrears

22   according to the terms of the plan, (FAC ¶ 19), and that

23   thereafter the trustee served a Notice of Final Cure Payment on

24   PNC, to which PNC failed to object, (id. ¶ 22).  In the

25   plaintiffs' bankruptcy proceeding, the bankruptcy court issued an

26   order confirming the plaintiffs' payments were completed,

27   adopting the trustee's finding that the "amount of unsecured

28
                                    7

1  claims discharged without payment" was zero and "the case was

2  completed on December 23, 2013." 2:12-bk-42019 (Bankr. E.D. Cal

3  2012) (Trustee's February 21, 2014 Final Report and Account

4  (Docket No. 23); March 28, 2014 Order Approving Final Report and

5  Discharging Trustee (Docket No. 27)).  The Order to Close Chapter

6  13 Case Without Discharge indicates that the only reason

7  plaintiffs failed to obtain a formal discharge was because they

8  did not complete an instructional course concerning financial

9  management, and not because their payments were not completed.

10 2:12-bk-42019 (Bankr. E.D. Cal 2012) (March 31, 2014 Order to

11 Close Chapter 13 Case Without Discharge (Docket No. 28)).

12 Plaintiffs' failure to obtain a formal discharge therefore does

13 not contradict their allegations that they paid off their arrears

14 pursuant to the chapter 13 plan.

15      Additionally, PNC does not address how the lack of a

16 formal discharge is fatal to any of plaintiffs' claims.

17 Plaintiffs' claims arise from PNC's misleading business practices

18 and their violation of Bankruptcy Rule 3002.1.  The court thus

19 finds PNC's allegation regarding the absence of a Chapter 13

20 formal discharge inapposite.

21      A.   Implied Covenant of Good Faith and Fair Dealing

22      "The law implies in every contract . . . a covenant

23 of good faith and fair dealing.  The implied promise requires

24 each contracting party to refrain from doing anything to injure

25 the right of the other to receive the agreement's benefits."

26 Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 720 (2007).

27 Plaintiffs allege PNC entered into a contract with them for a

28 loan secured by their property.  (FAC ¶ 48.)  According to

1  plaintiffs, they have substantially performed pursuant to that

2  contract, (id. ¶ 49), having made timely payments of the full

3  amount owed, (id. ¶¶ 16, 24).  Despite fully paying off the

4  arrears on their debt, (id. ¶ 20), in addition to keeping up with

5  their payment, PNC diverted plaintiffs' payments that should have

6  been applied to its loan balance to foreclosure fees and costs,

7  (id. ¶ 45).

8          PNC disputes that plaintiffs paid off the arrears and

9  argues that, for this reason, plaintiffs do not state a plausible

10  claim for breach of the implied covenant of good faith and fair

11  dealing.  (Def.'s Reply at 4-5.)  That is, because plaintiffs

12  "continued to be in arrears when their debt was not discharged in

13  bankruptcy," plaintiffs were in breach of contract and thus

14  cannot state a plausible claim for a breach of the covenant of

15  good faith and fair dealing.  (Id.)  On a motion to dismiss,

16  however, the court must accept plaintiffs' allegations as true.

17  See Scheuer, 416 U.S. at 236.  The court must thus accept

18  plaintiffs' allegations that their arrears were paid in full and

19  that they had performed pursuant to their loan contract.

20          PNC points to Exhibit 1, the May 2013 letter judicially

21  noticed by the court, to contradict plaintiffs' allegations that

22  they fully paid off the arrears.  (Def.'s Reply at 4-5.)  While

23  plaintiffs' allegations are taken as true and construed in the

24  light most favorable to them, "[t]he court need not . . . accept

25  as true allegations that contradict matters properly subject to

26  judicial notice or by exhibit."  Sprewell v. Golden State

27  Warriors, 266 F.3d 979, 988 (9th Cir. 2001).  PNC contends that

28  the May 2013 letter offering plaintiffs a reduced monthly payment

1  of $554.20 was in fact only an offer of a three-month trial plan.

2  PNC asserts that after the three-month trial period had expired,

3  plaintiffs continued to make the $554.20 monthly payment from

4  October through December 2013.  "Accordingly, the Bankruptcy

5  Trustee was not paying what was actually owed on the loan for at

6  least the last three months of 2013.  Therefore, plaintiffs were

7  still in arrears upon closing of the Chapter 13 plan even if all

8  allegations in the complaint are taken as true."  (Def.'s Mot. at

9  7.)

10          However, from the May 2013 letter, it is not at all

11  clear that the reduced payment plan was really only meant to last

12  three months.  In fact, the letter makes the "trial period" sound

13  like a prelude to a permanent modification.  The letter states,

14  "Based on a careful review of your mortgage account, we are

15  offering you an opportunity to enter into a Trial Period Plan for

16  a mortgage modification . . . ."  (Req. for Judicial Notice Ex.

17  1, at 3.)  The letter then tells plaintiffs to read all of the

18  information "so that you completely understand the actions you

19  need to take to successfully complete the Trial Period Plan to

20  permanently modify your mortgage."  (Id.)  In reply to the

21  frequently asked question, "When will I know if my loan can be

22  modified permanently and how will the modified loan balance be

23  determined?" the letter states,

24

25          Once you make all of your trial period payments on
          time and return to us the required copies of a
26          modification agreement with your signature, we will
          sign one copy and send it back to you so that you will
27          have a fully executed modification agreement detailing
          the terms of the modified loan. Any difference between
28          the amount of the trial period payments and your

10

regular mortgage payments will be added to the balance of your loan along with any other past due amounts as permitted by your loan documents.  <u>While this will increase the total amount that you owe, it should not significantly change the amount of your modified mortgage payment</u>."

(Req. for Judicial Notice Ex. 1 (emphasis added).)  The language of the May 2013 is thus susceptible to a reading that PNC intended for the trial plan to transition into a permanent modification to plaintiffs' loan.  Plaintiffs allege they made timely payments of the full amount due every month, $554.20, and would therefore be eligible for a permanent modification.  The May 2013 letter therefore does not contradict plaintiffs' allegations that they made full, timely payments; that their loan is current and the arrears are fully paid; and that $10,526.91 is a misleading representation of the character, amount, or legal status of their debt.  (FAC ¶¶ 26-27.)

        Therefore, although the court takes judicial notice of the letter, at PNC's request, the court finds the letter does not assist PNC on its motion to dismiss.  Plaintiffs plausibly allege that PNC injured their rights to receive the benefits of their loan contract by insisting that plaintiffs now owe $10,526.91 in arrears and fees despite plaintiffs' satisfaction of the arrears pursuant to their Chapter 13 plan.  By alleging PNC deprived them of a fair accounting of their debt under the loan contract, plaintiffs assert a plausible claim for breach of the implied covenant of good faith and fair dealing.  See <u>Wilson</u>, 42 Cal. 4th at 720.

        B.   <u>California's Unfair Competition Law ("UCL")</u>

11

1    The California UCL "provides an equitable means through
2    which both public prosecutors and private individuals can bring
3    suit to prevent unfair business practices and restore money or
4    property to victims of these practices." Yanting Zhang v.
5    Superior Court, 57 Cal. 4th 364, 370 (2013). The California
6    Business & Professions Code defines "unfair competition" to
7    include "any unlawful, unfair, or fraudulent business act or
8    practice." Cal. Bus. & Prof. Code § 17200. "'[The UCL]
9    establishes three varieties of unfair competition--acts or
10   practices which are unlawful, or unfair, or fraudulent.'" Cal-
11   Tech Commc'ns, 24 Cal. 4th 163, 180 (1999) (quoting Podolsky v.
12   First Healthcare Corp., 50 Cal. App. 4th 632, 647 (2d Dist.
13   1996)). "Each prong of the UCL is a separate and distinct theory
14   of liability." Kearns v. Ford Motor Co., 567 F.3d 1120, 1127
15   (9th Cir. 2009). PNC argues there is no statutory violation or
16   wrongful conduct upon which plaintiffs' UCL claim can be based.
17   (Def.'s Mot. at 8.)

18        Plaintiffs attempt to premise their UCL claim on the
19   fact that PNC "failed to file any response pursuant to FRBP
20   3002.1(g) to the final cure notice." (Pls.' Opp'n at 8; see FAC
21   ¶ 21.) Rule 3002.1 requires that once a creditor is served with
22   a notice of final cure payment," pursuant to 3002.1(f), a
23   creditor

24

25        shall serve on the debtor, debtor's counsel, and the
         trustee a statement indicating (1) whether it agrees
26       that the debtor has paid in full the amount required
         to cure the default on the claim, and (2) whether the
27       debtor is otherwise current on payments consistent
         with § 1322(b)(5) of the Code. The statement shall
28       itemize the required cure or postpetition amounts, if

any, that the holder contends remain unpaid as of the date of the statement.

Fed. R. Bankruptcy 3002.1(g).  The bankruptcy trustee executed a "notice of final cure payment" pursuant to 3002.1(f), but PNC failed to reply, as required by the rule, to confirm or deny that plaintiffs paid in full their arrears and whether plaintiffs were otherwise current on all payments.  (Id. ¶ 21.)[2]  Plaintiffs allege this conduct caused their bankruptcy plan to close prematurely in such a way that misled and damaged them.  (Id. ¶ 8.)  In April 2014, PNC told plaintiffs their loan was in default, insisting that plaintiffs were not current on their loan payments and owed $10,526.91.  (Id. ¶ 25.)

PNC cites two reasons why plaintiffs do not allege a plausible UCL claim premised on PNC's violation of U.S. Bankruptcy Code.  PNC argues that plaintiffs "have not pointed to any violation by PNC of the Bankruptcy Code.  Rather, they have merely argued that PNC did not timely object to the confirmed plan."  (Def.'s Mot. at 8.)  This is inaccurate, because plaintiffs specifically plead a violation of Bankruptcy Rule 3002.1, (FAC ¶ 41), which requires a timely response to the

_____

[2]   It should be noted that PNC had a duty not just to the plaintiff but to this court to comply with 3002.1.  The purpose of 3002.1 was to assist with the administration of § 1322(b)(5), which provides for the curing of a default within a reasonable time and maintenance of payments while the case is pending.  11 U.S.C. § 1322(b)(5).  "In order to be able to fulfill the obligations of § 1322(b)(5), a debtor and the trustee have to be informed of the exact amount needed to cure any prepetition arrearage . . . and the amount of the postpetition payment obligations."  Fed. R. Bankr. P. 3002.1 advisory committee's note.  A lender's failure to comply with the Rule has the potential to not only mislead or injure parties but also to interfere with bankruptcy procedure and the administration of justice.

1   confirmed plan.[3]

2          "By proscribing 'any unlawful' business act or

3   practice, the UCL borrows rules set out in other laws and makes

4   violations of those rules independently actionable." Yanting

5   Zhang, 57 Cal. 4th at 370 (internal quotation marks and citation

6   omitted).  The "unlawful" prong of the UCL encompasses "anything

7   that can properly be called a business practice and that at the

8   same time is forbidden by law." Rubin v. Green, 4 Cal. 4th 1187,

9   1201 (1993) (quoting Barquis v. Merchs. Collection Ass'n, 7 Cal.

10  3d 94, 114 (1972)).

11         Rule 3002.1(g) provides that a creditor "shall serve"

12  on the debtor and trustee a statement in response to the

13  trustee's Notice of Final Cure payment.  Another provision in

14  Rule 30002.1 permits the bankruptcy court to impose sanctions for

15  a lender's failure to comply with 3002.1(g), such as precluding

16  the creditor from presenting any omitted information as evidence

17  in any contested matter or adversary proceeding in the case, or

18  to award other appropriate relief, including reasonable expenses

19  and attorney's fees caused by the failure.  Fed. R. Bankr. P.

20  3002.1(i).  In fact, where a residential mortgage is at issue, a

21  debtor may be entitled to sanctions even after the case has

22  closed:

23

24         If, after the chapter 13 debtor has completed payments
           under the plan and the case has been closed, the
25         holder of a claim secured by the debtor's principal

26  _____

27         [3]    Although the court in ruling on this motion accepts
    plaintiffs' allegation as true, the court also notes that the
28  docket for plaintiffs' chapter 13 action confirms that PNC failed
    to respond to the trustee's Notice as required by 3002.1(g).

14

> residence seeks to recover amounts that should have
> been but were not disclosed under the rule, the debtor
> may move to have the case reopened in order to seek
> sanctions against the holder of the claim . . . .

Fed. R. Bankr. P. 3002.1 advisory committee's note.  PNC is thus

incorrect in their contention that their conduct was not

unlawful.  The Bankruptcy Code clearly required PNC to file a

response to the Notice of Final Cure Payment, which PNC failed to

do.  PNC's violation of Rule 3002.1(g) may not only serve as a

basis for a UCL claim, but also would have permitted plaintiffs

to reopen their chapter 13 case to seek sanctions.

　　　　PNC also argues plaintiffs lack standing to bring a

private cause of action under the UCL.  (Def.'s Mot. at 8.)

Standing to bring a private action under the UCL "is limited to

any 'person who has suffered injury in fact and has lost money or

property as a result of unfair competition.'"  Kwikset Corp. v.

Superior Court, 51 Cal. 4th 310, 321 (2011) (quoting § 17204).

The purpose of this provision is "to confine standing to those

actually injured by a defendant's business practices . . . ."

Id.  Plaintiffs allege they suffered loss because PNC misapplied

plaintiffs' current loan balance payments to the alleged

foreclosure fees and costs, increasing the overall loan balance

and reducing the equity in the property.  (FAC ¶ 45.)  A loss of

equity is within the scope of "lost money or property"

contemplated by the California legislature.  See Rufini v.

CitiMortgage, Inc., 227 Cal. App. 4th 299, 310-311 (1st Dist.

2014) (holding that plaintiff's allegation that the lender

deprived plaintiff of the opportunity to pursue other means of

15

1  avoiding foreclosure, leading to the loss of his home and the

2  equity he had in it, was sufficient to constitute "lost money or

3  property" under the UCL).  Having sufficiently alleged injury,

4  plaintiffs have standing to bring a UCL claim against PNC based

5  on the bank's violation of the Bankruptcy Code.

6          C.  Negligence

7          "The existence of a duty of care by a defendant to a

8  plaintiff is a prerequisite to establishing a claim for

9  negligence.  Whether a legal duty exists in a given case is

10 primarily a question of law."  Nymark v. Heart Fed. Savings &

11 Loan Ass'n, 231 Cal. App. 3d 1089, 1095 (3d Dist. 1991) (internal

12 quotation marks and citations omitted).

13         "[A]s a general rule, a financial institution owes no

14 duty of care to a borrower when the institution's involvement in

15 the loan transaction does not exceed the scope of its

16 conventional role as a mere lender of money."  Nymark, 231 Cal.

17 App. 3d at 1096.  But "Nymark and the cases cited therein do not

18 purport to state a legal principle that a lender can never be

19 held liable for negligence in its handling of a loan transaction

20 within its conventional role as a lender of money."  Jolley v.

21 Chase Home Finance LLC, 213 Cal. App. 4th 872, 898 (1st Dist.

22 2013) (quoting Ottolini v. Bank of Am., Civ. No. 3:11-477 EMC,

23 2011 WL 3652501, at *6 (N.D. Cal. Aug. 19, 2011) (holding that

24 where there was an ongoing dispute about the lender's performance

25 of the loan contract, and where the lender made specific

26 representations as to the likelihood of a loan modification, "a

27 cause of action for negligence has been stated that cannot be

28 properly resolved based on lack of duty alone").

1    Indeed, several courts have found the lender owed a

2  debtor a duty of care where it offered the debtor a trial loan

3  modification plan and then reneged, which appears to be similar

4  to plaintiffs' allegations in this case.  See Jolley, 213 Cal.

5  App. 4th at 905 (citing Asanelli v. JP Morgan Chase Bank, N.A.,

6  Civ. No. 3:10-3892 WA, 2011 WL 1134451, at *8 (N.D. Cal. Mar. 28,

7  2011) (holding that where the defendant "went beyond its role as

8  a silent lender and loan servicer to offer an opportunity to

9  plaintiffs for loan modification and to engage with them

10 concerning the trial plan," plaintiff's allegations constituted

11 "sufficient active participation to create a duty of care to

12 plaintiffs to support a claim for negligence"); Robinson v. Bank

13 of Am., Civ. No. 5:12-494 RMW PSG, 2012 WL 1932842 (N.D. Cal. May

14 29, 2012) (finding a duty where the lender allegedly executed and

15 breached the modification agreement, then engaged in a series of

16 contradictory and somewhat misleading communications with

17 plaintiff regarding the status of his loan)).

18    Here, similar to Asanelli and Robinson, plaintiffs

19 allege that PNC offered them a loan modification and then reneged

20 on March 12, 2014, well after plaintiff's obligations to make

21 payments through the Chapter 13 plan had terminated.  (FAC ¶ 23.)

22 Because Jolley, Asanelli, and Robinson support finding that PNC

23 owed plaintiffs a duty of care, the court rejects PNC's argument

24 that it owed no such duty.  Furthermore, plaintiffs sufficiently

25 allege that PNC breached its duty by negligently filing payment

26 changes in the plaintiffs' bankruptcy and by assessing erroneous

27 fees and arrears.  (Id. ¶ 55.)

28    D.    Rosenthal Fair Debt Collection Practices Act

1  ("RFDCPA")

2      The California legislature enacted the RFDCPA "to

3  prohibit debt collectors from engaging in unfair or deceptive

4  acts or practices in the collection of consumer debts and to

5  require debtors to act fairly in entering into and honoring such

6  debts . . . ."  Cal. Civ. Code § 1788.1.  The Act protects

7  consumers from certain debt collection practices, including,

8  inter alia, threats and unlawful conduct, § 1788.10; the use of

9  obscene or profane language, § 1788.11; under certain

10  circumstances, communications with the debtor's employer or

11  family member other than a spouse, 1788.12; and

12  misrepresentations in communications, § 1788.13.

13      PNC argues plaintiffs' RFDCPA claim fails as a matter

14  of law because PNC is not a "debt collector" within the meaning

15  of the statute.  The RFDCPA defines "debt collector" as "any

16  person who, in the ordinary course of business, regularly, on

17  behalf of himself or herself or others, engages in debt

18  collection." § 1788.2(c).  Several district courts have held

19  that the RFDCPA does not apply to lenders foreclosing on a

20  mortgage.  See Rosal v. First Fed. Bank of Cal., 671 F. Supp. 2d

21  1111, 1135 (N.D. Cal. 2009) ("[P]laintiff failed to plead that

22  any defendant was 'collecting a debt' because foreclosing on a

23  property pursuant to a deed of trust is not the collection of a

24  debt within the meaning of the RFDCPA."); Ricon v. Recontrust

25  Co., Civ No. 3:09-937 IEG JMA, 2009 WL 2407396, at *4 (S.D. Cal.

26  Aug. 4, 2009) ("Plaintiff's Rosenthal Act claim fails because the

27  Rosenthal Act does not apply to lenders foreclosing on a deed of

28  trust."); Pittman v. Barclays Capital Real Estate, Inc., Civ. No.

1  3:09-241 JM AJB, 2009 WL 1108889, at *3 (S.D. Cal. Apr. 24, 2009)

2  (holding plaintiff could not seek recovery under RFDCPA for the

3  lender's alleged misrepresentations regarding whether it would

4  foreclose "because a residential mortgage loan does not qualify

5  as a 'debt' under the statute").[4]

6          However, where a plaintiff's claim "arises out of debt

7  collection activities beyond the scope of the ordinary

8  foreclosure process, a remedy may be available under the RFDCPA."

9  Walters, 730 F. Supp. 2d at 1203 (holding the RFDCPA applied

10 where "the gravamen of plaintiff's claim is that [the lender]

11 engaged in a pattern of improper conduct in the course of

12 servicing her loan, ultimately causing the wrongful foreclosure

13 of the home"); see also Wilson v. Draper & Goldberg, P.L.L.C.,

14 443 F.3d 373, 376 (4th Cir. 2006) (interpreting the Federal

15 counterpart to the RFDCPA, noting that if the Federal Debt

16 Collection Practices Act did not apply to loans secured by

17 mortgages, that "would create an enormous loophole in the Act

18 immunizing any debt from coverage if that debt happened to be

19 secured by a real property interest and foreclosure proceedings

20

21  [4]      The statute defines "debt" as "money, property or their
    equivalent which is due or owning or alleged to be due or owing
22  from a natural person to another person."  § 1788.2(d).  It
    defines "consumer debt," as "money, property or their equivalent,
23  due or owing or alleged to be due or owing from a natural person
    to another person."  § 1788.2(e).  PNC argues separately that a
24  residential mortgage loan is not a debt under the act.  This is
    not truly a distinct argument, because the definition of "debt
25  collector" incorporates the term "debt," and the cases holding
    that a lender foreclosing on a residential mortgage is not a
26  "debt collector" do so on the basis that a residential mortgage
    is not a debt.  See Ricon, 2009 WL 2407396, at *4 (holding a
27  lender was not a debt collector based on the Act's definition of
    "consumer debts").
28

1  were used to collect the debt").  Like Walters, here plaintiffs'

2  allegations arise from PNC's allegedly improper conduct in

3  servicing their loan, outside of the foreclosure process, which

4  ultimately led to the wrongful foreclosure of their property.

5  (Id. ¶ 25.)  PNC's "debt collection" would thus come under the

6  purview of the RFDCPA.

7          PNC argues in the alternative that plaintiffs' RFDCPA

8  claim fails because the FAC does not allege that PNC's conduct

9  amounted to an unconscionable means to collect a debt.  (Def.'s

10  Mot. at 6.)  The court agrees that plaintiffs offer no supporting

11  factual allegations for such a conclusion regarding PNC's

12  unconscionable debt collection practices.  Moreover, plaintiffs

13  allege PNC engaged in "multiple violations" of the RFDCPA,

14  without further specifying which section of the Act.

15          Plaintiffs do plausibly allege that PNC's attempt to

16  collect from plaintiff $10,526.91 is a "false or misleading

17  representation of the character, amount or legal status of a

18  debt."  (FAC ¶ 26.)  While the RFDCPA does not contain a

19  provision prohibiting this conduct,[5] the RFDCPA incorporates by

20  reference sections of the Fair Debt Collection Practices Act,[6]

21          [5]     Section § 1788.13, "Misrepresentations in

22  Communications," does not appear to address a "misleading

    representation of a debt."

23

24          [6]     Cal. Civ. Code Section 1788.17 of the RFDCPA states

    that "every debt collector attempting to collect a consumer debt

25  shall comply with the provisions of [FDCPA] Sections 1692b to

    1692j . . . ."  "Federal judicial interpretations of the FDCPA

26  are incorporated into the Rosenthal Act by Civil Code § 1788.17

    such that a plaintiff may state a claim for violation of the

27  Rosenthal Act simply by showing that a defendant violated any of

    several provisions of the FDCPA."  Masuda v. Citibank, N.A., Civ.

28  No. 4:14-159 PJH, 2014 WL 1759580, at *2 (N.D. Cal. Apr. 29,

1   which prohibits "the false representation of the character,

2   amount, or legal status of any debt."  15 U.S.C. § 1692e(2)(A).

3   Because PNC insists plaintiffs are not current on their loan

4   payments and continue to owe arrears, foreclosure fees and costs

5   despite plaintiffs' timely monthly payments and PNC's failure to

6   object to the Notice of Final Cure Payment issued by the

7   bankruptcy trustee, the $10,526.91 can fairly be said to

8   constitute a "false representation" of the "amount . . . of a

9   debt."  Therefore, plaintiffs have stated a claim under the

10  RFDCPA as it incorporates § 1692e(2)(A) of the FDCPA.

11          IT IS THEREFORE ORDERED that defendant's motion to

12  dismiss be, and the same hereby is, DENIED.

13  Dated:  November 18, 2014

14  _____

      WILLIAM B. SHUBB

15    UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28  2014).

                                21